People v Harris (2022 NY Slip Op 04193)

People v Harris

2022 NY Slip Op 04193

Decided on June 30, 2022

Appellate Division, Third Department

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided and Entered:June 30, 2022

111779
[*1]The People of the State of New York, Respondent,
v
Paul Harris, Appellant.

Calendar Date:May 31, 2022

Before:Garry, P.J., Egan Jr., Clark, Aarons and McShan, JJ.

John R. Trice, Elmira, for appellant, and appellant pro se.
P. David Soares, District Attorney, Albany (Emily Schultz of counsel), for respondent.

McShan, J.
Appeal from a judgment of the Supreme Court (McDonough, J.), rendered May 16, 2019 in Albany County, upon a verdict convicting defendant of the crime of burglary in the second degree (four counts).
Between December 21, 2017 and January 12, 2018, four homes in Albany County were burglarized. Those burglaries occurred in the Village of Altamont (counts one and two), the Town of Colonie (count three) and the Town of Guilderland (count four). The third burglary produced a lead that ultimately directed investigators to defendant. In January 2018, defendant was indicted on four counts of burglary in the second degree and, following a jury trial, he was convicted as charged. He was later sentenced, as a persistent violent felony offender, to a prison term of 25 years to life for each count, with counts 1 and 2 of the indictment to run consecutively to one another, and counts 3 and 4 to run concurrently with count 1, for an aggregate total prison term of 50 years to life. Defendant appeals.
Defendant contends that his convictions are not supported by legally sufficient evidence and that the verdict is against the weight of the evidence, contending that he was not the perpetrator of the burglaries and that the stolen items were not under his control. "In reviewing legal sufficiency, this Court must 'view the evidence in the light most favorable to the People and evaluate whether there is any valid line of reasoning and permissible inferences which could lead a rational person to the conclusion reached by the jury on the basis of the evidence at trial and as a matter of law satisfy the proof and burden requirements for every element of the crime[s] charged'" (People v Watkins, 180 AD3d 1222, 1223-1224 [2020], lvs denied 35 NY3d 1026, 1030 [2020], quoting People v Henry, 173 AD3d 1470, 1473 [2019], lv denied 34 NY3d 932 [2019]; see People v Oliveras, 203 AD3d 1233, 1234 [2022]). In contrast, "[w]hen assessing whether a verdict is supported by the weight of the evidence, we must first determine whether, based on all the credible evidence, a different finding would not have been unreasonable, and, if it would have been reasonable for the jury to reach a different conclusion, then we must weigh the relative probative force of conflicting testimony and the relative strength of conflicting inferences that may be drawn from the testimony to determine whether the jury has failed to give the evidence the weight it should be accorded" (People v Harris, 203 AD3d 1320, 1321 [2022] [internal quotation marks, brackets and citations omitted], lvs denied ___ NY3d ___, ___ [May 9, 2022]; see People v Forney, 183 AD3d 1113, 1114 [2020], lv denied 35 NY3d 1065 [2020]). As relevant here, "[a] person is guilty of burglary in the second degree when he [or she] knowingly enters or remains unlawfully in a building with intent to commit a crime therein, and when . . . [t]he building is a dwelling" (Penal Law § 140.25 [2]; see People v Oliveras, 203 AD3d at 1235).
At [*2]trial, the People elicited testimony from John Pietrzak, who lived with defendant during the relevant timeframe and admitted that he had participated in three of the four burglaries by driving defendant to the various locations. As for the first burglary on Sand Street in the Village of Altamont, Pietrzak explained that, on December 21, 2017, defendant asked Pietrzak to "drive for him while he . . . broke into a house." Pietrzak testified that defendant wanted Pietrzak to pull up and let defendant out, and then continue driving around the block until he saw defendant exit. Pietrzak testified that on that day he drove defendant to a house on Sand Street in the Village of Altamont. According to Pietrzak, upon arriving near the home, defendant "got out, put on his gloves, hat, crowbar, [and] walked away." After circling the area for several minutes, Pietrzak spotted defendant walking back to the car with a bag in his hand. Pietrzak testified that when defendant got back in the vehicle, he pulled out cash and "[a] bunch of coins." The owner of that burglarized residence (hereinafter victim No. 1) testified that he had returned home from work and noticed that a kitchen window and one of the two doors to the home were open. Victim No. 1 observed that a chair had been placed under the kitchen window that appeared as though "it was used to climb in." The contents of several rooms were strewn about, and various items were missing from the home, including jewelry, cash and an alarm clock that was in a bedroom. A forensic scientist with the New York State forensic investigation center testified that DNA swabs were lifted from the windowsill and that the partial mixture profile from the swabs was "consistent with DNA from at least two donors with the major contributor matching [defendant]."
With respect to the second burglary, on January 5, 2018, the Altamont Police Department responded to a report of another burglary on Western Avenue. The homeowner (hereinafter victim No. 2) testified that he returned home from work and discovered that his back door had been "kicked in" and that every drawer inside of the residence had been opened and it appeared as though someone had gone through them. According to victim No. 2, several items were missing from his residence, including his son's Versace sunglasses and a jar of change. A neighbor also observed a "6-foot slim subject wearing dark clothing" and a "dark hat" exit the passenger side of a maroon vehicle, and later observed him leaving while carrying an object. The neighbor also observed defendant get back into the maroon car, which had made several passes by the residence while the individual was inside. Pietrzak confirmed that he drove defendant to the Western Avenue house on that date. According to Pietrzak, defendant got out of the vehicle, took his crowbar and asked Pietrzak to "[d]rive away" and "wait for him." Pietrzak recalled that defendant returned to the vehicle with a "bunch of change[*3]."
Regarding the third burglary, the homeowner of a residence on Old Niskayuna Road in the Town of Colonie (hereinafter victim No. 3) testified that she had returned home on January 10, 2018 and discovered that her back door was wide open and that there were signs of forced entry. Upon entering her residence, victim No. 3 noticed that her possessions were strewn about and that certain items of jewelry were missing. Further, two employees who worked in an adjacent warehouse testified that they had observed a maroon Mercury Sable [FN1] that they did not recognize parked in the warehouse parking lot and also observed a young male in the vehicle who appeared to be "uneasy" and was" fidgeting around in the car." The employees later observed "an older gentleman" who was "wearing jeans, a black Carhartt jacket, a black beanie" and black boots return to the vehicle carrying a laundry basket with a black bag inside of it, which he placed in the back seat of the car before getting into the vehicle and departing from the lot. One of the employees identified defendant in court as the individual he had observed that day. Pietrzak testified that on that date he and defendant drove to a residence on Old Niskayuna Road and parked in the parking lot of the neighboring building. Pietrzak also testified that defendant left the vehicle and returned with a laundry basket "filled with gold chains[ and] jewelry."
As for the fourth burglary, the People presented evidence that, on January 12, 2018, the homeowner of a residence on State Farm Road in the Town of Guilderland (hereinafter victim No. 4) returned home from an appointment and discovered that his back door was open and was damaged around the molding. Victim No. 4 observed a crowbar in the residence and that several drawers in his home had been opened, and testified that several items were missing including his class ring and two large water jugs filled with a collection of change that he estimated amounted to approximately $10,000. Various items from all four burglaries were later recovered from the residence that defendant shared with Pietrzak. At trial, each of the victims confirmed that those items were the same ones that were taken from their residences.
For his part, defendant testified that he was not the perpetrator of the four burglaries. He noted that he was recently released from prison in February 2017 after serving a 26-year sentence, and that he "would have to be some kind of fool to go out and do a burglary knowing that they're going to put [him] away forever." Defendant averred that Pietrzak had implored him to visit the home on Old Niskayuna Road to meet someone that wanted to sell defendant some items. According to defendant, he met an individual at the address and purchased some "stuff" from that individual and left. Defendant suggested that he was unfamiliar with the other residences that had been burglarized. On cross-examination, defendant stated that the individual he met at the [*4]Old Niskayuna Road address was selling "a tray with a bunch of rings on it and a bag with some change and stuff in it." Defendant also averred that the jacket in which victim No. 4's ring was found was a "[c]ommunity jacket[]" that everyone in his home would wear, including Pietrzak and a tenant that stayed in a second bedroom.
We find that the evidence was legally sufficient to support defendant's convictions. Each victim confirmed that the location of the burglary was his or her residence and that defendant was not authorized to enter (see People v Lancaster, 200 AD3d 1352, 1355 [2021], lv denied 38 NY3d 951 [2022]; People v Bruno, 63 AD3d 1297, 1300 [2009], lv denied 13 NY3d 858 [2009]; see also People v Brown, 203 AD3d 666, 666-667 [2022]). Further, defendant's intent may be inferred from the forced entry into each of the dwellings (see People v Oliveras, 203 AD3d at 1237-1238; People v Cason, 203 AD3d 1309, 1311, 1314 [2022]; see also People v Hajratalli, 200 AD3d 1332, 1336 [2021], lv denied ___ NY3d ___ [May 31, 2022]). As to defendant's contention concerning his identity as the perpetrator, the testimony of Pietrzak, the DNA evidence obtained from the scene of the Sand Street residence and the allowable inference that arose from his possession of property that was stolen during the burglaries and recovered from his home were sufficient to support his convictions (see People v Boyer, 181 AD3d 516, 517 [2020], lv denied 35 NY3d 1093 [2020]; People v Cole, 162 AD3d 1219, 1224 [2018], lv denied 32 NY3d 1002 [2018]; People v Barnes, 156 AD3d 1417, 1420 [2017], lv denied 31 NY3d 1078 [2018]; People v Rodriguez, 153 AD3d 235, 237 [2017], affd 31 NY3d 1067 [2018]; People v Fomby, 101 AD3d 1355, 1356 [2012]).
As to the weight of the evidence, defendant stresses that the evidence overwhelmingly points to Pietrzak as the perpetrator of the burglaries. At trial, defendant assailed the credibility of Pietrzak, noting his past drug use and his deal with the People to testify against defendant. Defendant also presented his own expert witness to cast doubt on the DNA evidence presented by the People. Because the jury could have rejected the DNA evidence, discredited Pietrzak based upon his arrangement with the People and accepted the conflicting testimony of defendant as to his involvement, a different verdict would not have been unreasonable (see People v Cade, 203 AD3d 1221, 1223-1224 [2022]; People v Vandenburg, 189 AD3d 1772, 1776 [2020], lv denied 36 NY3d 1054 [2021]; People v Wakefield, 175 AD3d 158, 165 [2019], affd ___ NY3d ___, 2022 NY Slip Op 02771 [2022]; People v Whetstone, 136 AD3d 476, 476 [2016], lv denied 27 NY3d 1009 [2016]; People v Conklin, 63 AD3d 1276, 1277 [2009], lv denied 13 NY3d 859 [2009]; People v Khuong Dinh Pham, 31 AD3d 962, 965 [2006]). However, viewing the evidence in a neutral light while giving deference to the jury's credibility determinations leads us to the conclusion that the convictions are not against the [*5]weight of the evidence (see People v Cade, 203 AD3d at 1224; People v Hodgins, 202 AD3d 1377, 1379, 1381 [2022]; People v Hilton, 185 AD3d 1147, 1148 [2020], lv denied 35 NY3d 1095 [2020]; People v Sindoni, 178 AD3d 1128, 1131 [2019]; People v Mosley, 121 AD3d 1169, 1172-1173 [2014], lv denied 24 NY3d 1086 [2014]).
Turning to defendant's remaining arguments, to the extent that defendant's pro se brief raises constitutional issues concerning his right to counsel, we may consider his argument despite his failure to formally move for a substitution of counsel (see People v Puccini, 145 AD3d 1107, 1109 [2016], lv denied 29 NY3d 1035 [2017]). However, we have reviewed his contention and conclude that it lacks merit. At a December 2018 hearing, three months prior to trial, Supreme Court provided defendant with an adequate opportunity to expound upon concerns he had raised about his counsel in a letter. At that hearing, defendant conferred with counsel several times and, despite being given an opportunity, declined to address the court about his concerns. Supreme Court directly asked defendant if he was making any application at that time, to which he replied, "Absolutely not" (see People v Stedge, 135 AD3d 1174, 1176 [2016]; see also People v Nieves, 166 AD3d 1380, 1381 [2018], lvs denied 33 NY3d 975, 979 [2019]). On the eve of trial, defendant again suggested that he wanted new counsel assigned, this time asserting that his counsel had a potential conflict of interest due to a decade-old prior representation of an individual that may or may not be the adult child of one of the victims. We find no merit to defendant's claim that, under these circumstances, his attorney had a potential conflict of interest that impacted on the defense (see People v Tomasky, 36 AD3d 1025, 1026-1027 [2007], lv denied 8 NY3d 927 [2007]; People v Smith, 271 AD2d 752, 753 [2000]; see also People v Pabon, 157 AD3d 1057, 1058 [2018], lv denied 31 NY3d 986 [2018]). Accordingly, we conclude that Supreme Court properly denied his request to substitute counsel on that basis (see People v Porto, 16 NY3d 93, 100 [2010]; People v Thornton, 167 AD2d 935, 935 [1990], lv denied 78 NY2d 1082 [1991]; see also People v Mejias, 293 AD2d 819, 820 [2002], lv denied 98 NY2d 699 [2002]). Further, although defendant suggested at a hearing three days before trial commenced that he intended on hiring his own counsel, there is no evidence that he took any steps to do so and we find no error in Supreme Court declining to adjourn the trial at that late stage (see People v O'Daniel, 105 AD3d 1144, 1147 [2013], affd 24 NY3d 134 [2014]; compare People v Branham, 59 AD3d 244, 245 [2009]; People v Mao-Sheng Lin, 50 AD3d 1251, 1253 [2008], lv denied 10 NY3d 961 [2008]; People v Mack, 39 AD3d 882, 885 [2007]).
As to his sentence, we initially find that Supreme Court properly adjudicated defendant a persistent violent felony offender without conducting a hearing, as defendant failed to present anything [*6]beyond "'conclusory allegations that his prior conviction was unconstitutionally obtained'" (People v Gumbs, 107 AD3d 548, 549 [2013], lv denied 22 NY3d 1156 [2014], cert denied 574 US 857 [2014], quoting People v Konstantinides, 14 NY3d 1, 15 [2009]; see People v Henry, 166 AD3d 1213, 1215 [2018], lv denied 33 NY3d 949 [2019]). As to whether the sentence was unduly harsh or severe, we note that the 25-year minimum period on the indeterminate life sentences imposed on defendant on each count was the maximum allowed within the statutory guidelines based upon his status as a persistent violent felony offender (see Penal Law § 70.08 [3] [c]; see also Penal Law § 140.25) and Supreme Court was free to impose the sentences for each count consecutively (see People v Suits, 158 AD3d 949, 951 [2018]; see also People v Casatelli, 204 AD3d 1092, 1098-1099 [2022]; People v Hodges, 199 AD3d 1015, 1017 [2021], lv denied 37 NY3d 1161 [2022]). Nevertheless, we find that the aggregate sentence of 50 years to life is unduly harsh and severe (see People v Seda, 35 AD3d 1162, 1162 [2006], lv denied 8 NY3d 927 [2007]; People v Robinson, 258 AD2d 817, 818 [1999], lv denied 93 NY2d 978 [1999]). We therefore find it appropriate to modify the sentence to run all of the counts concurrently (see People v Drumgold, ___ AD3d ___, ___, 2022 NY Slip Op 03544, *3 [2022]; People v Hajratalli, 200 AD3d at 1339-1340; People v Evans, 212 AD2d 626, 627 [1995], lv denied 86 NY2d 841 [1995]; People v Wilkes, 132 AD2d 982, 983 [1987], lv denied 70 NY2d 804 [1987]).
Finally, to the extent that defendant's pro se brief alleges certain failings on the part of his counsel throughout the course of his representation, such contentions are either not established by the record or "do[] not amount to ineffective assistance, especially when viewing counsel's representation as a whole" (People v Kerrick, ___ AD3d ___, ___, 2022 NY Slip Op 03941, *2 [2022]; People v Starnes, ___ AD3d ___, ___, 2022 NY Slip Op 03764, *9 [2022]; People v Starr, 114 AD3d 813, 814 [2014], lv denied 23 NY3d 1068 [2014]). We have reviewed defendant's remaining contentions and find them to be without merit.
Garry, P.J., Egan Jr., Clark and Aarons, JJ., concur.
ORDERED that the judgment is modified, as a matter of discretion in the interest of justice, by directing that defendant's sentences on all counts of the indictment shall run concurrently to each other, and, as so modified, affirmed.

Footnotes

Footnote 1: The evidence at trial confirmed that defendant was the owner of that vehicle.